Mr. Gura for the appellant. Mr. Tenney for the appellate. Mr. Gura, we meet again. Good morning, Your Honors. May it please the Court, Alan Gura for the appellant. The Court's first question, if I may start with the Court's order of December 22nd. The Court's first question from that order suggests that there may be a possible ambiguity in the text of the complaint with respect to whether or not there is an as-applied or a facial challenge or both types of challenges to Section 922A9. Now, under this Court's precedent, ambiguities in the text are interpreted liberally in the light most favorable to the plaintiff. And while we would contend that it's really not all that ambiguous after all, it certainly cannot be said on this record the text excludes an as-applied challenge or excludes a facial challenge when the district judge below, now Circuit Judge Wilkins, agreed with the government's strenuous argument that the complaint alleged only an as-applied challenge to Section 922A9. In any event, it's the text of the complaint here that governs, and if I could just review it very quickly in the light, in the time that's available to us to cover all these many issues, the I don't claim that the section violates the Constitution generally or that it's simply unconstitutional. Paragraphs 26 and 30 especially complain that this section limits otherwise qualified American citizens and that it therefore violates the plaintiff's individual rights, not everyone's. But you are bringing the facial challenge to A9, right? That's correct. Let me ask you some questions about that. Let's imagine that Mr. Durth had a cache of 100 firearms that was at his parents' house in Ohio. He had bought them before he expatriated, leaves them at his parents' house in Ohio. When he comes back to Ohio, he can use those. How is A9 or B3 a burden on him under those facts? Under those facts, well, as this Court held in Parker and later the Supreme Court affirmed in Heller, the ability to access one firearm does not mean that you lose all your rights to access. He's got 100 at his parents' house in Ohio. Why should he be able to... Is it some sort of burden on him to not be able to get them? Sure. If he had 100 books and the government prevented him from purchasing the 101st book, if he wished to worship 100 different gods and the government took away his idols after a certain amount... He could bring them with him, right? That's right. If he had purchased guns, he did not, however... So under that... No, we're talking hypothetically. I mean, it's a facial challenge, right? So we're looking for circumstances where the law may be valid. But wouldn't it be valid in that case? He had bought guns before, took them with him to Canada. Why can't he bring them back with him? He can bring them back under D4. There's no problem. D4 would allow him to bring back those guns that he had purchased prior to expatriating. However, the law would still bar him from acquiring any firearms. So same answer. Your answer is he needs to get more. If he had bought... Instead of the 100 guns being stored at his parents' house, he had taken them to Canada and could bring them back under D4. Your point is he ought to be able to... Absolutely. People buy firearms... If he brought all 100 back with him on that trip... The question... And the statute forbids him from getting another one? The question is not... Your Honor, the question is not whether he can move back and forth the 100 that he had purchased. The question is whether or not he has an interest in acquiring a firearm. Okay. Let's try another. How about a non-resident alien without a visa? Okay? Non-resident alien without a visa. My cousin from Italy who's coming over for the weekend to attend my daughter's marriage. He's going to be here two days or so. Under the statute, he can't purchase a gun because he's not a resident of the state. Is that burdening a constitutional right? Does he have a constitutional right to buy a gun for self-defense for those two days that he's here? Courts have split about the Second Amendment rights of aliens. We have opinions about non-legal aliens. You're not talking about legal... There's really not much case law about that. Our contention is that, again, if you are amongst the people of the United States... And by the way, once you're in the American borders, you are entitled to the protection of all the various fundamental constitutional rights that attach to individuals generally. The government can't prevent your cousin from worshiping, from speaking to the same extent in most cases as American citizens are allowed to within our nation. And so it would be hard to imagine why the government would deign to allow your cousin to have a firearm for sporting purposes but not for purposes of self-defense. It seems that the ability of aliens to defend their lives should be... Well, the question is whether he has constitutional... I'm not so certain your description of the extent of the Constitution goes quite that far. So you'd say two days here, he gets the right to defend himself by buying a gun. We would bring that claim, but we did not. That's just a hypothetical. We're exploring your facial challenge. That's right. Okay, thanks. Pete, we know very little about Mr. Durth other than from the caption on his complaint that lists his address as Winnipeg in Manitoba. We don't know... I don't know how old he is, I don't know where he lived before he went to Canada, I don't know what type of gun he tried to purchase, I don't know where he tried to make the allegations of two purchases, I don't know what his occupation is, I don't know whether he pays federal income taxes, I don't know whether he pays state income taxes, I don't know whether he votes in federal and what district he's voting in, I don't know whether he pays state taxes, I don't know whether he votes in state elections. Now, all of those factors, it seems to me, bear on an as-applied challenge in this case, and yet I don't have any information about any of it. Your Honor, the as-applied challenge is based upon the fact that Mr. Durth is, and there is a record on this, he did declare, and the government did not challenge at all, the fact that he is fully qualified, he is not prohibited from possessing guns in the United States for any lawful purpose, and in fact the government... And the other thing I don't know is how often he travels to the United States and where he goes when he travels to the United States. At least in your complaint that was filed in Ohio originally, there was an allegation that he tried to make a purchase in Minnesota. There's no such allegation here. And that troubles me because even if we agreed with you and struck down both of these provisions in 922, he still couldn't buy a gun. He couldn't buy a gun in Minnesota, and he couldn't buy a handgun in Ohio either, because there was no evidence that he could buy a handgun in Minnesota, because that requires either residence in Ohio or Minnesota, or in a contiguous state. So we're in a purely academic exercise if the states in which he travels, in which he tried to buy a gun as applied, were Ohio and Minnesota, because no matter what we do, he still can't buy a gun. Your Honor, I'm not sure the record is quite as the question describes. First of all, Mr. Durkis said he would purchase a firearm in the United States. There are many states where he does not need to be a state resident in order to purchase a firearm. Such as? Texas is one of them. We just had a nice lawsuit in Mance v. Holder, where … Yeah, but that's fine, but you want an as applied. That's right. How many times has Mr. – we don't know how many times Mr. Durkis has been in Texas. We don't know whether he's ever been in Texas, and we don't know whether he travels to Texas or has plans to. All that goes to an as applied challenge. None of it is on the record here. The joint appendix, page 29, states that Mr. Durkis regularly travels to the United States on business, in the United States of America. That's another question I have, and I mentioned. I don't know what his occupation is. Let's suppose that he owns a corporation, and the corporation is registered in Delaware. The corporation could buy a gun. Your Honor. Is he? Your Honor, one does not need to have a corporation in Delaware in order to purchase a firearm in the United States. One needs to be a non-prohibited person under federal and state law, and Mr. Durkis, he's challenging a federal law. There is no federal prohibition on his possession or acquisition of firearms, aside from those particular items. Could he buy it in Ohio? Could he buy it under state law in Ohio on his next visit to his B-9 and B-3, next visit to Ohio, would he be able to buy a firearm? I would have to look that up. I don't have that. Well, that's kind of fundamental, isn't it? The government's got a long footnote in their original brief, and I've looked at Ohio law, and the answer is no. He could not buy. I don't know what kind of gun he tried to buy, but let's assume it's a handgun, which Howard tells us is the weapon of choice for home protection, right? He couldn't do it. He couldn't buy one in Ohio, and he couldn't buy one in Minnesota. There are many states in which he could. We have alleged that he would go to the United States. What he's interested in doing is having a gun available to him in the United States. There's nothing that prevents him from buying a gun in a state and then having that gun stored at his parents' home in Ohio, which is what the complaint in the declaration states that he would do. There's no federal law and there's no state law in Ohio that I believe would prevent him. Ohio, I don't believe. I'm fairly, on this much, I'm willing to hold that states generally don't forbid the transportation of firearms into their borders. There are very few states that require registration of firearms. Ohio's not among those, and I'm not aware of any law that he'd be violating if he were to purchase a gun in some other state and bring it into Ohio, just like the government does not challenge at all. In fact, the government welcomes Mr. Durth to purchase a gun in Canada and bring it to the United States. Suppose the evidence shows that when he comes to the United States for business, he goes and has for years only gone to Minnesota and Ohio, that he's never been in Texas and he's never been in Louisiana. Mr. Durth has stated on the record that he would acquire a firearm in the United States. If the law were to allow him to do that, he would go ahead and do that. And the fact of the matter is that... How does he drive? We don't even know how he travels to the United States. Usually he drives. Well, I don't know that. Is there an obligation to that? It is not required to, Your Honor, if I may, none of these questions, while they're certainly interesting to some degree, they're not, they don't bear on the ability to purchase a firearm. But they do bear on whether you have an as-applied challenge to A-9. They are questions that deal with Mr. Durth's particular circumstances that bear on the issue that we have before us with respect to the constitutionality of A-9. And if it turns out that the only place he ever goes, for example, is Ohio... Well, let's suppose he only goes to Maryland. You know, Maryland, you have to be a resident of the state of Maryland. I'm a resident of the state of Maryland, and I know this. And then you have to go through a training course that consumes weeks and weeks before you can go, even if you are a resident, before you can go purchase a handgun. That may be constitutional, may not be, but certainly he couldn't walk into a gun shop in Maryland, assuming the federal law was overturned, and get a hand? Couldn't do it? Your Honor, the as-applied challenge asks whether or not the government can carry its burden, and the government does have the burden here, of applying these laws, whether it can meet the burden of showing that applying these laws to Mr. Durth is consistent with his constitutional rights. Where has he said that he would buy a gun anywhere in the United States that was available? Well, he said that, page 29 of the Joint Appendix, paragraph 6, this is in the Statement of Undisputed Material Facts and References to the Declaration, paragraph 3, Durth intends to purchase firearms within the United States, which he would store securely at his girlfriend's home in Unvernon, Ohio, and which he would access for lawful sporting purposes as well as for other purposes, including self-defense, while visiting the United States. That's in the record, that's in the Declaration, paragraph 3, and it's in the separate statement, and I don't believe that the government objected to that or contested that at all, and it's below. That sentence, will you read that sentence again to me? Sure. Durth intends to purchase firearms within the United States. For sporting purposes? Which he would access for lawful sporting purposes as well as for other purposes, including self-defense. I mean, that is ambiguous. I don't know whether what he's saying there is, I'm going to buy a .30-06 rifle because I want to go deer hunting. And by the way, I'm going to use it for self-defense too. And as I understand the government's position, he could do that. A .30-06 for deer hunting is not going to be a firearm that's suitable for personal self-defense in just about most circumstances. Mr. Durth also declares that he... What evidence do we have on that? Well, I think it's something that would be within judicial notice almost. I mean, I recall that Justice Scalia was talking during the Heller argument about different guns being suitable for turkey hunting and other practices, and everyone got a great big laugh out of that. I think it's fairly obvious that a large hunting rifle is not something that people would ordinarily carry with them. They can't get around corners within your house, but nevertheless... People generally don't carry those in American tradition and practice for personal self-defense when they're out and about in public. We don't see that. So we should assume that when he says sporting purposes and other lawful... What do we have to assume? That he wants to buy a rifle or get a rifle for sporting purposes and then he wants to get a handgun for other lawful purposes? Some guns are useful for some purposes and others are useful for other purposes, but the fact is... If I can shift gears... Sure. If your challenge was only to B3, it wouldn't do you any good, right? No, I think it would still do us some good because even if, at the very least then, Mr. Dirk would be able to receive a firearm for a sporting purpose. He could go buy that .30-06, which is a plainly... I may be still obscure, and I apologize. As long as A9 is on the books, a win on B3 doesn't do you any good because you still can't buy or purchase a firearm, right? Well, if A9 is on the books, A9 doesn't talk about purchase. It talks about receiving, and you have to receive it only for a lawful sporting purpose. And so A9 would not appear to impact the purchase of a firearm for a sporting purpose. So it's entirely possible to win on B3 even without challenging A9. But how can you receive a firearm under A9 even if B3 is unconstitutional? Well, if B3 is unconstitutional, then a person can go ahead, and Mr. Dirk or another expatriate American could purchase a firearm and receive it for a sporting purpose. The government says that it's okay to take those firearms received for a sporting purpose and use them in self-defense. We don't agree with their line of argument, but that's the government's argument. What if he says, I have no interest in sporting purposes? I don't want to go to target practice. I don't want to hunt. I just want this gun to defend myself. Well, in that case, then he couldn't do it. Right, right. Then striking B3 doesn't get you all you want. If he disavowed completely a sporting purpose. But he is interested also in sporting purposes. There are some firearms that the government would allow. No, the hypothetical I'm giving you is that he's not interested in sporting. He just wants to defend himself. If he just wants to defend himself and he wants a gun and the purpose of obtaining that gun is to be able to defend himself, then A9 is an impediment. But B3 does not talk about purposes for which one would purchase a firearm. And if I may, Your Honors, even if we are, I know time is obviously limited to 15 minutes and many, many questions, but if I may, Your Honors, even if we are talking about a facial challenge, I'm not sure exactly how far that advances the government's fault because we're talking here about the fact that the court, the second question the court asked is about Salerno, right? And how would this court go about applying Salerno? Well, as the Ninth Circuit identified in the Jackson case, first of all, there's a question of whether to apply a facial threshold test in any event because this is not a very complicated law. It does not turn upon the manner in which it's enforced by the government. And at least that appellate court said, we don't even look to one of these threshold facial challenge tests because it doesn't raise the concerns that normally concern courts when one is dealing with a facial challenge. If we were to get through that examination and we're going to apply some kind of a facial threshold challenge, then the question becomes, okay, which challenge would it be? Would it be, I mean, which test would it be? Would it be the Salerno no set of circumstances test or perhaps the test that's used in the First Circuit, the Second Circuit, the Ninth Circuit, and just last month in Mann's, which also references the plainly legitimate sweep test. I don't understand that. That language is from Justice Stevens' separate opinion joined only by Justice Stevens in Glucksburg. And Justice Thomas, when Justice Thomas mentioned it, he just simply said at a minimum all justices agree because he wanted Stevens' vote in whatever that fairly more recent case was. But Salerno is there and the Supreme Court has never departed from it and this plainly legitimate sweep business has commanded the vote of one justice. That's not, you know, we're not here. There's a case called Rodriguez v. SEC you're probably familiar with that says that if the Supreme Court wants to overrule or change its law, then it's up to them to do it, not for a lower court. Well, Your Honor, there was definitely more than one justice who voted in the abortion cases and there were several of them that went with the large fraction test, which is really the same thing as plainly legitimate sweep. The abortion cases I grant you are, the First Amendment overbreath doctrine is totally the opposite of the Salerno test. And I think there's been a lot of commentary about this and I think the other area of the law that's kind of grown up with sort of an overbreath doctrine are the abortion cases. I think you're right. But beyond that, the Supreme Court has never applied the overbreath doctrine. Well, Your Honors, the fact of the matter is that three circuits have gone ahead and applied the plainly legitimate sweep test. They've referenced that test. Courts are applying it. But we haven't, right? We haven't. And it would be – That's not a test. Well, it is a test. It asks to see whether or not the applications are such that there's a plainly legitimate sweep to the statute. And the fact of the matter is, Your Honors, is that we do have – what we don't have in this country is a hierarchy of rights. We can't say that First Amendment concerns are somehow more important than the Second Amendment, that abortion rights are more important than the Second Amendment. It's not a question. The theory behind the overbreath doctrine in the First Amendment is that people will be chilled and they say you would never get the person who's subjected to the restriction to bring a case. So what they do is they allow other people to bring a case that deals with other people's rights. I don't – there's no chilling effect that would occur in the Second Amendment. Well, there's no – If you went to a store, tried to buy a gun and did it again. There's no attempt here to necessarily raise the rights of other people while our own rights are not implicated. If we look to see, for example, in Heller and Parker before then in this court, there was no Salerno test applied to those cases, and we know absolutely that there are many violent felons and mentally ill people and dangerous individuals who have no business possessing handguns, and nobody would ever claim that those individuals should have handguns. Yet those laws were struck down as a facial matter, and the only way that we can reconcile Salerno with the plain language of not just the Supreme Court in Heller, but this court in Parker, which those were facial challenges, and there was no as-applied question at all in those cases. The only way we can reconcile those is to either go the Ninth Circuit route, which says that Salerno's inquiry doesn't apply unless those concerns are triggered, or as the Seventh Circuit, for example, did in Eazell, to start by carving out all the exceptions before we go ahead and apply the no set of circumstances, which is sort of an odd way of doing that. This is what they did in Eazell. They started by saying no set of circumstances, but then focused only on the fact that law-abiding, responsible citizens were impacted, which is exactly the situation here. I grant you there is tension between Heller and Salerno, but the author of Heller, Justice Scalia, also wrote a case called Reno v. Flores, which invoked the Salerno movement. You've read the back-and-forth between Justice Scalia and Justice Stevens, who's the one on the court. But they were going at it for years, back-and-forth, back-and-forth, back-and-forth. But I go back to Rodriguez, I think it's versus SEC. But there it is. That's what Salerno says, and we've got to follow. Well, Salerno is plainly ñ Salerno was a 1987 case. The Second Amendment was not on anybody's radar. It was a long ways away from being discussed. And when the Supreme Court had the chance to discuss the Second Amendment in depth, it told us what I think everybody agrees on, which is to say that this is a right that is not going to be enjoyed by everyone, that there are going to be dangerous people who are not going to be able to make these claims. That doesn't mean you don't have facial challenges under the Second Amendment. The court was aware of Salerno, I am certain, in Heller. The justices didn't forget about that case. They were as aware of it as this court was in suggesting the question in its order. But the fact of the matter is that Salerno's construct is not compatible with the Second Amendment, and maybe that's why circuit court after circuit court is going ahead with the plain legitimate sweep test. But even if we're going to apply Salerno judgment, even if we're going to have Salerno govern this case, the question then becomes, are there any circumstances where it would be lawful to tell people that they can't acquire a gun for the purpose of self-defense, excluding, of course, people who are prohibited or mentally ill or dangerous for some reason that takes them outside of Heller or outside of the Second Amendment? And the answer here I would submit is no. Or what about aliens? Yeah, I just came to that. That's right. Because, well, the courts usually deal with illegal aliens by saying that they're not part of the American community, they're not people who are entitled to Second Amendment rights. But my cousin coming for two days over the weekend, that's not going to fly. That's not going to fly. You know that's not going to fly. Well, what I would submit is let's talk about not your cousin, but let's talk about the hypothetical smuggler who is supposed to be targeted by the scheme, right? The government says this is designed to make sure that if Judge Griffith's cousin comes to the United States and acquires a firearm, he doesn't go ahead and put that in his luggage and take it back to England, right? Even the punitive smuggler would have the ability to use that firearm for self-defense, should be able to defend his life if he's attacked by some criminal, right? Forty percent of the visitors to the United States in the year 2012 came in for less than 90 days without a visa. So it's a large population. And I think it's a stretch to say that they're entitled to buy a gun to defend themselves. But we're not. And so clearly, A9 is valid with respect to them. The government has a legitimate interest in saying these folks who are not part of the community, they're here temporarily, but we're not going to let them buy guns. Well, A9 doesn't talk about buying guns. A9 only talks about receiving guns. And so obviously, with the purchase of a firearm, you may have additional issues that may not impact, say, a loan or some sort of more temporary aspect, which is another topic the government discusses. But the fact of the matter is, if the government has determined that someone should be able to acquire a firearm legally, the people who are covered by A9, A9 doesn't talk about people who are outside the American community, if you have people who should be able to have. Where do you get that from? I mean, there is a statute that talks about folks who have visas, right? That's right. If you have a visa, then you have this restriction. A9 clearly applies to those who are here without a visa, and that's 40 percent of the folks. It doesn't apply to us. It's a large group. Okay, I misspoke. I'm talking about the Second Amendment interest that people may have. How is it that the government can say to somebody? To follow that argument, you'd have to get us to say that these folks have a Second Amendment interest. That would be an extension of law, and I think it would probably run afoul of Verdugo, but at least on my hypothetical it did, somebody here for two days. It's hard to make my cousin part of we the people. Well, Your Honors, the fact of the matter is that if we look to the government's burden here, if we're going to apply, if we're going to go by their standards, if we're going to make this a means-ends inquiry, if we're going to make this some kind of a balancing test, and if we're going to apply intermediate scrutiny, which is their preferred test if we go that route, where exactly, how can they, what's the fit? What is the relationship between smuggling and self-defense or residents and smuggling? There's not a single shred of evidence in the record anywhere to support these assertions, which are sort of half-baked, really. I mean, there's no way that, there's no attempt made, really, in the record. Well, your strongest argument, it seems to me, is to try to make this distinction between rental and possession. If someone's going to be allowed to rent a gun for sporting purposes, why can't they rent a gun for self-defense? And we'll hear from them on that. But I think you've got some problems on your facial challenge. I think you've got some serious problems. In your as-applied challenge, you've got some bleeding problems, perhaps. If we have no Second Amendment claim in terms of that aspect, then we still have, then we're down to rational basis. We submit it's not even rational. There is no rational basis to deprive people of the ability to defend themselves if we're going to give them guns and say, here's a gun. Just don't defend yourself with it. Go out and go engage in hunting or target shooting. I mean, if we're down to rational basis land, this is still a law that doesn't exist. These statutes were passed before Heller, right? That's right. I'm not one to care a great deal about legislative history, but the floor debates here all talk about a different era before Heller. So it wasn't thought of in those terms. And, Your Honor, let's not forget we also have a right to travel challenge, which we haven't talked about too much. But that's a right that is not a right enjoyed by your cousin in Italy. That's the Fifth Amendment can't-be-dulls right that American citizens have. It's a rational basis review for that, right? No, actually. Lyndon B. Rusk, the circuit, said it's strictly scrutinized. The right to travel is a strict scrutiny right, and we have a briefing on that. The fact of the matter is that that's – I mean, we briefed it. There's no point in rereading the briefs into the record here. But that is a fundamental right, as the Supreme Court has told us many times. Under SABI, it's a right that the overbreath doctrine applies to. Literally, they've said that. A majority of the Supreme Court has applied overbreath to the right to travel. Before we sit down, I have one question about the allegation that Mr. Dirk holds a concealed carry permit from the state of Utah. Do you know whether, as many states do, do you know whether Utah requires that to be renewed periodically? Some states it's every three years. Some states it's every two years. And if you don't renew it, it's no longer valid. Do you know? Off the top of my head, no, but I'd be happy to look at it. Let's have a third round of supplemental briefing. Any more questions? All right, thank you. Thank you so much. Mr. Tenney? May it please the Court, the provisions at issue here regulate the purchase of firearms and the receipt of firearms. They do not regulate the possession of firearms. And as came out in the questioning, we don't know from the record here, and I just want to make clear, although we've been talking about the complaint, this case is on summary judgment. So we can also look at Mr. Dirk's declaration, and that's the only evidence that we have of his actual circumstances. That doesn't say anything different than the complaints? No, it doesn't. But my point is simply that if you're talking about his burden, it's not a matter of construing his pleadings liberally. He actually has a burden of coming forward with evidence, and so reading between the lines of the complaint wouldn't even take you so far. But in any event, we don't know whether Mr. Dirk has access to guns. There was a hypothetical posed, does he have a lot of firearms that he has access to while he was in the United States. He hasn't alleged that that's not the case. He hasn't alleged that he doesn't have an ability to possess firearms for purposes of self-defense in the United States. So I think that is a big problem, whether you conceive of his case as a facial challenge or as an as-applied challenge for his argument here. And his argument essentially is that no matter how many guns he has, no matter how much access he has to guns, the Second Amendment confers on him a right to acquire additional guns. And another point I just wanted to clarify about what he's alleging here is what he's talking about is purchasing additional guns. That's what he says he wants to do. He's not claiming he wants to rent a firearm. He's not claiming he wants to buy a firearm and that he's prohibited from doing that. But the statute doesn't make a distinction. It talks about terms of receipt, right? Well, there's two statutes. A-9 talks in terms of receipt. My point is that if he's saying now on appeal, my problem is that A-9 is unfair because it limits it to sporting purposes and it doesn't allow it for self-defense. First of all, to the extent that he's saying, all right, I give up. I don't get to purchase a gun. I just want to rent a gun. That's not the complaint that he's brought. That's not the claim that he's made. The claim he's made is he wanted to purchase a gun. The other problem, of course, that he has is that he does want to use it for sporting purposes. He says so. That's one of the few things he does say in his declaration on page 32. And so A-9 wouldn't be an impediment to him in that regard. I've forgotten that. Does that declaration talk in terms of firearms singular or firearms plural? In other words, is it the same firearm? He wants to purchase a firearm for sporting purposes and other lawful purposes. In other words, it can be construed as the same firearm? I mean, what he says is I would intend to purchase firearms within the United States, which I would store securely at my—I'm on 32 of the joint appendix— which I would store securely at my relative's home in Mount Vernon, Ohio, and which I would access, and he doesn't distinguish among them, for lawful sporting purposes as well as for other purposes, including self-defense. Is there anything in federal law that would prohibit him from storing the firearms if he were able to purchase them at his relative's home in Ohio? Not that I'm aware of. It's not a legal transfer? I mean, I think you would need to know more, and we don't know a lot on this record about how they were stored and whether— if he sort of gave them to someone else and then got them back, then his receipts when he returned might be a problem, but I don't think that that's— As we're talking about his travel, what restrictions, if any, are there on putting a firearm in your luggage for an overseas trip? I mean, there are rules about how you do that. It's not prohibited. He hasn't alleged that it's those rules that are causing him a problem, and I can't speak exhaustively to what you do and don't have to do. You have to make some sort of declaration to the carrier, don't you? I think that's correct, and obviously you need to do— That's only for common carrier. I mean, if he's driving, we don't know how he gets to the United States. Correct, Your Honor. And, I mean, you also obviously have to deal with TSA. If you're going on a plane, you can't just sort of stick a firearm in your luggage and not tell anybody, unsurprisingly. So we think that the case can just be resolved on this basis alone, that his allegations really is—and we heard it from the podium, too— that his allegation really is, I have a right to purchase additional firearms regardless of my circumstances, whether I have access to guns or I don't. And we just don't think that that is correct as a matter of Second Amendment law, and that that's his claim, and that's the only evidence that he's put forward. With respect to B-3, as I recall, the allegations and the request for relief are to strike down B-3 as applied to all law-abiding United States citizens who have a residence outside of the territorial jurisdiction of the United States, right? That's more or less the terms in which I— Isn't that a class action, then, if it's all similarly situated and he's excluding aliens and mentally ill and felons and so on and so forth? Wait, doesn't that have to be certified as a class action before that can be adjudicated? If that was—in order for him to obtain that relief, that would have to be a class action. If he wants to bring an as-applied challenge on behalf of himself and he says— The only facts that I'm giving you about myself is that I'm a law-abiding citizen who lives overseas. I may have guns, I may not. I may bring them in, I may not. I may rent them, I may not. I'm not telling you any of that. I think that those circumstances and those circumstances alone entitle me under the Second Amendment to purchase a gun while I'm in the United States. If a court were to agree with that—we don't agree with that, obviously. If a court were to agree with that, then he could prevail on that claim. He wouldn't get the relief he's asking for in the complaint. He would get an injunction that the relevant statutes couldn't be applied to him in the circumstances that he's described. For reasons that I can go into, some of which I've already discussed, we don't think that that states a good Second Amendment claim. I just want to touch on—we've talked a lot about the limitations of his right and his claims. I just want to talk also about the interest served by the government's restriction here. These have been discussed in the briefing, but just to make sure we're clear that the government has strong interests here. What we're talking about here is people in the case of B-3, people who may reside in a different state than the case of A-9, people who don't have a residence in the United States. So we're talking about people who are not where they normally live acquiring firearms. And the allegation of this complaint is that he wants to do so permanently. And the federal government has an interest in making sure that somebody who is either visiting somewhere who is transient, who doesn't have a current home, or whose home is not in the United States, that they can't just go to whichever state they choose that has the most permissive firearms laws, purchase a gun, and then take it to wherever they're actually going. In the case of residence, that's—of the United States, that's accomplished. So the statute's determined that in case of rental for sporting purposes, that the government's interest is largely met, be more so met than it is in the case of purchase, because the owner has an interest in following it, right? It's less likely to disappear into the smuggler's hand, right? Right. So what is the possible distinction, then, between allowing someone to rent a gun so that they can go target shooting, but not allow them to rent again since they—to defend themselves? A core right of the Second Amendment. What's the possible distinction? Well, I can tell you the reasons that the statute was written the way that it was and then explain why we think it's perfectly consistent with the Second Amendment. What Congress was dealing with— The statute was written at a time before Heller, right? Right, but— And you're saying that those who were writing the statute did so having in mind that the core right of the Second Amendment is the protection of individual ability to defend oneself? No, we're not claiming that at all. What I'm saying is we're not asking this Court to defer to Congress's judgments about what the Second Amendment did and didn't require. We wouldn't be asking this Court to do that even if the statute was passed yesterday. The point is that Congress made certain determinations about what was likely to happen, predictive judgments, what was appropriate subject for legislation. And if I could just explain those and then explain how that now fits with the Second Amendment. So what Congress was—Congress enacted these restrictions, and then the problem that Congress was trying to address was that there was a significant interest in people who want to engage in sporting activity with firearms in places other than where they live, and that includes both people who live in the United States and then want to travel somewhere else within the United States and engage in sporting activity, whatever that may be, which could include target shooting, which might be more likely to be handguns, or it could include hunting, which maybe in some circumstances will be more likely to be long guns, but either one would be covered. There are also people who travel here from overseas and who either the only or express purpose of their travel is sporting activity or one of the things that they want to do while they're here. And Congress had this significant number of people that they expected to do this that had long done this, and they didn't want to make that a federal crime, and so they enacted a statute and they said if that's what you're doing, because there's a lot of people who do that and we don't want to make it a federal crime, that's okay and you can get a gun and you can rent it or you can borrow it and we're not going to criminalize that. Now that's the reason Congress enacted the statute they did. I'm not aware of evidence then or now that there are a lot of people who said, I do want to travel briefly in the United States, and what I really need to do is I don't want to do sporting purposes, I don't even want to do target shooting in order to practice using the gun that I've just borrowed. But it's not hard to imagine a situation where someone arrives and they find out they're in an area that's a little more dangerous than they thought, and you're going to allow them to rent it to go to the target practice, why doesn't the statute allow them to rent it to protect themselves? We don't have such a person in this case, and I don't know of any evidence. Mr. Durst says he wants to use it for sporting purposes, just to be clear. And self-defense. Right, but you're hypothesizing a person who has no interest in self-defense, I mean in sporting purposes. Now the question on the Second Amendment question, if we had such a person before the court then the court would have to entertain that question, you don't here. But if you did have such a person before the court, the question would be on intermediate scrutiny if that was what was thought to be applied. I'm not sure I follow. Such a person, the person is... This is a hypothetical person who does not want to engage in sporting purposes at all, and they want to borrow, in my understanding of the hypothetical, they want to borrow a firearm just for use for self-defense while they're visiting the United States. Isn't Mr. Durst's allegation that that is exactly the situation he's in? No, because he says he wants to use it for sporting purposes. And for other lawful purposes. And one way of reading that allegation, and this is a problem that I have that's so fuzzy, is I want to buy a Browning over and under shotgun for sporting purposes, and I also want to buy a handgun for other lawful purposes, namely self-defense. Well, that's certainly not what he said. That's a fair reading of his declaration and his complaint, isn't it? I mean, I don't think that that's inconsistent with the text of his declaration. I think on summary judgment, if his problem was that he thought that the gun that he wanted for sporting purposes and the gun that he wanted for self-defense were two different guns, and that he didn't want to purchase, he just wanted to rent or borrow, then we submit that he would have to put in a much different declaration from the one that he's written. While you're mentioning that, the government moved for summary judgment as well as Mr. Durth and the Second Amendment Foundation. They were cross motions, correct? That's correct. The law is that a district court, and I assume some of it rubs off to us, has discretion, even though the case is right for summary judgment, to not accept either motion and force the case to evidentiary hearing. Isn't that correct? Yes, that's correct. In circumstances where there's a genuine issue of material fact. Even if there's not, district courts have discretion to say, look, we've got this case, I'm going to force it to an evidentiary hearing. Even though both sides agree that there are no material issues, I want absolute proof. I don't want declarations. I want live witnesses. I think a district court could do that. I think if a district court concluded on the record that as a matter of law, one party or the other was entitled to prevail, if this court agreed with it, then the right outcome would be. I think the law is that even if the district court thinks there are no material issues, the district court still has discretion to force the case to trial. Right. My point here is simply that that's not what the district court did here. We don't think the district court abuses discretion in doing that. And you're suggesting that it would be inappropriate for us to do that. Well, I'm saying the district court didn't abuse its discretion and reached the correct outcome, so the appropriate thing would be to force it. Back to your statutory argument. So it seems to me that you're making the case for why Congress gave this benefit to folks who are going to visit here and go hunting. I understand that. But you also have to make the argument for why Congress excluded self-defense from their reasoning because they don't allow you, under the statute, you can't come to when you're here, you can't get it just for self-defense. So tell me why it is you think that Congress excluded self-defense. Well, they didn't expressly exclude it, but they didn't include it in the It works as an exclusion. It does work that way, but I guess the reason I'm drawing that distinction is that Congress was, as I mentioned, Congress was trying to address a circumstance that was coming up, which was people wanted to do this for self-defense. And they did it before Heller. They did it before Heller. They certainly did it before Heller. But even after Heller, if we're on intermediate scrutiny, which we think is at most what we're on here, then the question is whether Congress had to account for particular circumstances and whether the statute is insufficiently tailored because they didn't account for people who want to visit the United States, obtain a gun. I understand the hypothetical would be temporarily, which is different from Mr. Durth. Don't want to use it for sporting purposes, again, different from Mr. Durth. And whether the failure to account, even if you accept that such people would have a sufficient Second Amendment interest in doing that, that this is something Congress might have been thought to want to account for, whether the failure to do that fails as a matter of intermediate scrutiny. And intermediate scrutiny is about a reasonable fit. And so if Congress accounts for the run of circumstances that it's going to encounter, which we've already discussed, many of which have already been discussed, aliens, people who are here for a very short amount of time, people who already have firearms for self-defense, and significantly the large category of people who want to use the firearms for sporting purposes, if Congress accounts for those large categories, and then there's this other category that, again, the plaintiff in this case is not in, either before Congress or in court, who is in that circumstance. And then if we had that case, we would say, you know, okay, it's reasonable for Congress not to have accounted for this particular narrow set of hypothetical facts. Did I hear you correctly earlier? On the face of it, these provisions in the federal law do not make a distinction between long guns and handguns, although many state laws do. I think that's true of A9. Well, B3 does. Not a distinction that's relevant to Mr. Durth's circumstances, but under B3 you can, in some circumstances, purchase a long gun in a state where you're not a resident, as long as the purchase would comply with the laws of both states. For handguns, it works differently. So there is a distinction in that sense. If A9 and B3 don't make a distinction between long guns and handguns, then that means that a handgun can be used for sporting purposes? Yes, because target shooting has been recognized as a sporting purpose, and that was in the legislative history. You can't buy one, but you can borrow one for target practice? Well, in the case of a person who's visiting the United States, that makes perfect sense, because one of the core reasons to have the residency requirement for people who are buying guns relates to where those guns are going to end up, and also if something happens with the gun, the ability to trace the gun by going to the residence of the purchaser and figure out what's happened to this gun. It makes perfect sense. If you're talking about someone who's visiting the United States temporarily and doesn't have a residence here, to distinguish between letting those people borrow those guns and then give them back before they go back to wherever they're going, as opposed to allowing them to buy the guns, it makes eminent sense to do it that way. Yeah, but it raises a question in my mind that Judge Griffith has asked you, and I don't know that I have heard the answer. Doesn't that mean that sporting purposes are more important than self-defense, and if so, what's the rationale behind that? Why can't you rent a handgun for self-defense when you can rent a handgun to shoot at a paper target? I don't think it means that one is more important than the other. I mean, I think that the reason that the language is in the statute is that one is much more prevalent than the other and that Congress was addressing the circumstances that had arisen, that they were aware of, and that they wanted to make sure, you know, if Congress criminalized... How many expatriates are there? I don't know the numbers. I'm sorry. The number 26 million sticks in my mind. I don't know. I may be wrong about that. Maybe Mr. Gurin is. But out of those 26 million, if only a small percentage wanted to use it just for self-defense, rent one just for self-defense, that's still a significant number of people, isn't it? Say it's 5%. It could be. I mean, obviously we would be speculating. I wouldn't be surprised. I think that the scenario in which you visit a place that is not your home... Well, again, this reminds me of something Justice Scalia just said last week. Maybe it's not what Congress intended. It's what they did. They created this statute that has this effect, that if you are a citizen of the United States and you're coming back to visit, you can rent a gun to shoot at a target practice, but you can't rent a gun to defend yourself? What could be the possible rationale for that? Well, I mean, I've explained why it evolved the way it did. I understand why it evolved the way it did. I mean, another point, obviously, and we're talking about how this has ended up. I'm not here arguing that this is why Congress did it the way it did. As I think came up in an earlier colloquy, in some circumstances there are prerequisites to acquiring a gun, including that you go through training or other proficiency. If you have people, and this much is in the legislative history, that if you have people who are doing sporting purposes, who are learning how to handle their gun, that is likely to be a safer population than people who just say... I can understand why Congress would be troubled if someone... But that's regulated by state law, isn't it? In some circumstances it is, but... I mean, is there anything in federal law that requires training or any of that? No, my only point was, if you're asking me to explain, and again, I'm not saying this is what Congress had in mind, but if you're asking why it would be legitimate to say someone who's going to take a gun and go to a range and use it for target practice and what are our safety concerns there versus somebody who's going to take a gun, disavows any intention to engage in any target practice, any intention to operate the gun in any circumstances other than an emergency when they think they're in trouble, one could reasonably expect that Congress would want to distinguish those scenarios. Target practice is a sporting purpose? It has long been recognized as one, yes, Your Honor. So in other words, let's suppose that the next paper comes to the state of Maryland and wants to rent a gun, and the state has a requirement, which it doesn't, that you have to have certain training before you rent a gun, and the training consists, as it usually does, of shooting at targets. So that's a sporting purpose? The training that the state requires before you can handle or receive a firearm is a sporting purpose? I believe it has been read that way, and I recognize that that's a broad reading, but that only underscores the limited scope of the provision. Thank you, Your Honor. Why don't you take two minutes? Fantastic. Thank you very much. First of all, a sporting purpose, Your Honors, has been given a very narrow purpose. It excludes typically casual, generic, plinking, and practical shooting. We have cases that we've cited on that. Page 31 of our opening brief. Is that in the regulations? I don't believe that the regulations define it, but that's how this Court affirmed the district court here in Springfield v. Buckles, 116F2nd8590, which took a very, very narrow view of sporting purposes, and I believe the site here is 292F3rd818, and that term is construed very narrowly, as the Court would see the opinion. Your Honor, Judge Randolph, in response to your questions, first of all, a review here is de novo, so whatever a district court might do on summary judgment motions can be done here as well, and we submit that the possibility of a remand to clarify some of the issues perhaps would be the correct way to approach it. That's a good point. By the way, a handgun doesn't do you any good unless you have ammunition, and there's no allegation here that restrictions on acquiring ammunition are unconstitutional. I don't believe there's a restriction on ammunition that we're challenging. I don't believe that Mr. Girth is prohibited from buying ammunition. The prohibition on A-9 talks about receiving a firearm, and B-3 talks about purchasing firearms. Do you know if that includes ammunition? There's never a need to fill out a Form 4473 when purchasing ammunition. I don't believe that there are restrictions on ammunition that are relevant. That's all state control? That's correct, Your Honor. There might be federal laws dealing with ammunition, but actually the Federal Gun Control Act typically deals with firearms. There are some forms of ammunition that are regulated and prohibited, but that's not really an issue here. And you're right, Judge Randolph, there is no it here. The complaint does speak plurally of guns. The government does a great job of telling us how the statute evolved, but it didn't present any evidence that actually justifies it under even intermediate scrutiny. There's no evidence that shows that there is a reasonable fit to some kind of a perceived problem. The only thing we're told in terms of evidence is that in a 10-year period they convicted 143 people, which is not that great a number, over a 10-year period of, I believe, violating 922G5, which is the illegal export provision. But that's a very small drop in the bucket compared to the total pool of people who are impacted by this law. If you're a licensed dealer and your residence is in Italy, you can receive a firearm, right? If you're licensed by the federal government, forget about state law, and you're a resident of Italy, you come into the United States, it's perfectly proper for you to receive a firearm, correct? I believe that would be the case. Even though you have no state residence? I believe that would be correct because the law, I believe, B-3 and A-9 speak about it. I'm thinking about A-9. That's right. It says any person except a licensed collector or dealer, but it doesn't say anything about whether the licensed person resides in any state. As a matter of fact, the assumption that seems to be on A-9 is that this individual does not reside in any state. Otherwise, there's no need for the exception. That's correct, Your Honor. I believe licensees are required to have some place of business the ATF can come visit, but as far as their residence is concerned, I'm not sure that they have a requirement to be American residents in order to hold and maintain a license. So what if Mr. Durth is a licensed gun dealer in Canada? We don't know what his occupation is. He has an Internet business that he runs, a hosting business and a few other related things, and we can get to that on remand if we do wind up going that route here. Well, that surprised me, Mr. Guru, that early on in your argument you were resisting the notion of remand and saying that there's a sufficient record here that we can reach the issues, but now you seem to be changing a different tack. Do you think a remand is appropriate here? Remand is possible. We'd rather have a remand than a loss, you know, obviously. If the court is unclear about things. Now, let's go back. I mean, look, Judge Wilkins, obviously a bright man, has a chemistry degree, I believe, right? He thought this was an as-applied challenge. The government was very strongly jumping up and down about it being an as-applied challenge. Now this court might see it differently. Perhaps some of these things can be cleared up. I just want to address really quickly, if I may, Judge Randolph's question about the access issue. This actually happens oftentimes if you have a spouse who is a prohibited person and the other spouse is not a prohibited person. Can the non-prohibited spouse maintain a firearm? The answer is yes. The only limitation there is that the prohibited spouse can't have access to the gun. There's an interesting Third Circuit case on this called U.S. v. Hewitt, H-U-E-T, that talks about the evidence needed to show that actually the gun was not made available to the prohibited person and therefore there was no enabling violation committed by the non-prohibited spouse. So if Mr. Durst's relatives in Ohio were, say, a husband and wife, and they were both convicted felons, and there's no allegation about them at all, and he stores the firearms with them after winning this case, that there would be nothing illegal? If it was locked up in a safe and they didn't have any way of accessing it, it just simply happens to be located on the property, if those two people owned a self-storage? It was just put in a closet. Yeah. Again, that would be a factual question. But, you know, if felons owned a self-storage business and somebody wanted to store firearms in a locked locker that way, I don't believe that that would be any violation of federal law. I've not seen cases that would suggest that. But in any event, what we do have then, finally, Your Honor, as I know we're way over time, it's the fifth question, which is really the most interesting of the five questions that this Court asked here. Because the government tells us not to worry about 478, not to worry about 924-D1 and 478-115, because if the regulations were read in that manner, in that fashion, the fashion that they obviously are written, and the government elected to pursue an enforcement action, there would be no criminal penalties and there would be no perpetrator unless they actually demonstrated by claiming to be seeing evidence that a willful violation had occurred. Well, that sounds very reassuring. I mean, they basically – Well, it's also wrong. They overlooked the regulations. 478-111 says it's unlawful. Yeah. And they don't say anything about that in their briefs, at least that I recall. That's right. On the statute, the statutory argument, it looks like it might be a good argument, but I didn't see any reference to the regulations, which – But the fact of the matter is, even when everything is said and done about this logic of getting the firearms from some other country, the law does not allow them – does not allow Americans to bring back the firearm unless they have a lawful sporting purpose. And there's also reference to a shooting activity that has to take place. Right. They've got to give it back when it's over. As soon as the shooting activity is over, you've got to give it back. There's no room for self-defense. There's no room for self-defense at all. Thank you very much.
judges: Henderson, Henderson, Griffith, Griffith, Randolph, Randolph